Aaron B. Clark (15404)
Trinity Jordan (15875)
**DENTONS DURHAM JONES PINEGAR**
111 South Main Street, Suite 2400
Salt Lake City, Utah 84101
Telephone: (801) 415-3000
Email: aaron.clark@dentons.com
trinity.jordan@dentons.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| MATHEW SHAW and BROOKE SHAW,<br><br>Plaintiffs,<br><br>v.<br><br>JULIUS MWALE and KAILA MWALE,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. _____<br><br>Judge _____ |

Plaintiffs Mathew Shaw and Brooke Shaw, by their undersigned counsel, state as follows for their Complaint against Defendants Julius and Kaila Mwale.

### PARTIES

1. Mathew Shaw ("Mat") is a resident of Utah.

2. Brooke Shaw ("Brooke") is a resident of Utah.

3. Julius Mwale ("Julius") is a citizen of Kenya. His primary residence is located in California. He also owns a residence in New York.

4. Kaila Mwale ("Kaila") is a citizen of New York.

**JURISDICTION & VENUE**

5. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000 and is between Plaintiffs, who are citizens of Utah, and Defendants, who are respectively a citizen of a foreign state and domiciled in California and a citizen of New York.

6. The Court has specific personal jurisdiction over Defendants because, as set forth in the allegations below, Plaintiffs' claims rise from Defendants' contacts and activities in the State of Utah, including but not limited to directing fraudulent representations toward Plaintiffs in Utah.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

**FACTUAL BACKGROUND**

*Julius and Kaila Mwale Make the Initial Connection with the Shaws*

8. Mat and Brooke Shaw (collectively the "Shaws") first met Julius and Kaila Mwale (collectively the "Mwales") on February 18, 2022, at the home of Gordon Bowen in Holladay, Utah, where Mat and Savanna Shaw (the Shaws' oldest daughter) performed for guests that were invited to a private dinner party.

9. The dinner included a number of wealthy, influential, and prominent attendees.

10. The Mwales also attended the February 18, 2022, dinner.

11. Presenting themselves as billionaires, the Mwales made an immediate connection with the Shaws, initially under the guise that their children could be friends.

12. Soon after making this connection, Julius began sending Mat text messages sharing recordings of supposedly private video calls and emails with prominent individuals such as Senator Mitt Romney, Meg Whitman (the U.S. Ambassador to Kenya), Ruth Porat (CFO of Google), David Beasley (president of UN World Food Program), and others.

13. Julius also shared supposedly confidential contracts with prominent companies, all in an apparent effort to bolster his credibility with the Shaws.

14. Other videos Julius sent appeared to show the Mwale children on what was represented to be one of the Mwales' private jets.

15. Julius represented on February 18, 2022 (and many times thereafter) that he owned the jet, though the Shaws have since learned Julius does not own the jet but leases it from a company in which Julius has no ownership interest.

16. The Mwales also invited the Shaws to visit their estate in San Jose, California, which they did on several occasions.

17. Julius represented in May 2022 that he and Kaila owned this estate, though the Shaws would later learn that neither Julius nor any holding company he owns has title to the property.

18. During the Shaws' visits to the San Jose property, the Mwales showed off extravagant features of the estate, including expensive cars (that they claimed to own) worth hundreds of thousands of dollars, and a wine cellar they claimed held a wine collection valued at approximately $250 million.

19. The Mwales also claimed that they owned a jewelry collection worth $870 million.

20. In further overtures to strengthen ties with the Shaws, the Mwales expressed interest in being "godparents" to the Shaw children.

21. The purpose – and, ultimately, the effect – of these interactions was to suggest to the Shaws that the Mwales were persons of importance and influence, with access to power and significant means, and that associating with them would provide the Shaws with potentially lucrative opportunities.

*The Mwales Reveal their Pitch*

22. The Mwales then began sharing with the Shaws their vision of "changing the world" and "solving world hunger."

23. The Mwales also offered to include the Shaws in their plans, which they claimed would give the Shaws an opportunity to build "generational wealth."

24. By March 2022 – and specifically on or around March 18, 2022 – the Mwales were pushing the Shaws to contribute to a series of investment opportunities run by Julius.

25. In the March 18, 2022, meeting – an in-person meeting at the San Jose estate with Julius and Kaila – the Mwales represented that the Shaws' investments would generally be put toward building a battery manufacturing plant and surrounding infrastructure.

26. In a later in-person meeting on May 20, 2022, Julius represented that several African countries had gifted him millions of acres of land to help build energy-efficient self-sustaining cities, similar to one he claimed to have already built in his hometown in Kenya.

27. Julius further claimed at this May 20, 2022, meeting that the Shaws' money would be spent on geological surveys in the Democratic Republic of the Congo (DRC) to build infrastructure that would eventually support a battery manufacturing plant.

28. Also at the March 18, 2022, meeting, the Mwales made each of the following claims set forth in paragraphs 29 through 41.

29. The Mwales claimed that local farmers in the area of these cities they were helping to develop benefitted from the rising value of the nearby land, making them millionaires (in U.S. dollars).

30. The Mwales claimed that their programs included development of the surrounding area, including building a luxury golf course on donated land and building rental homes on the farmers' properties (to be donated to the farmer for free) so they could generate rental income.

31. The Mwales claimed that they had built the largest, most advanced hospital in the world, with state-of-the-art technology, five thousand beds, and an advanced cancer treatment facility.

32. Julius represented that he had been gifted land that included 12 undeveloped cobalt mines in various parts of Africa, including the DRC, to develop in order to build battery manufacturing plants.

33. The Mwales introduced the Shaws to certain individuals that were close partners in their operations, including a man named Derek William, whom the Mwales represented was a rocket scientist they had "poached" from Boeing, and who supposedly owned the company "KE International."

34. The Mwales also introduced the Shaws to "Christine Allyn," who was supposedly Julius's chief of staff.

35. The Mwales claimed Christine was a former personal assistant for Kofi Annan, a former United Nations general secretary.

SL_6781140.1

36. Julius represented that KE International was an independent, third-party construction and engineering company that he had awarded the contract to for the purpose of building these self-sustaining cities.

37. The Mwales told the Shaws that the Mwales typically relied on their own assets for investment opportunities of this kind, but that they were "allowing" a close circle of family and friends, including the Shaws, to contribute upwards of $50 million as outside investors in the project.

38. Julius told the Shaws that "the window was closing" and time was "running out" and that he wanted them to be able to participate in the investment.

39. Julius offered to take money from the Shaws as a "loan" with a guaranteed twenty percent per annum return. Nevertheless, the Mwales both assured the Shaws that the upside on their investment would not be limited to repayment on the loan but would be rolled into the investment with the potential to generate returns of ten times the initial contribution.

40. The Mwales provided further reassurance by promising that if the Shaws ever wanted the money they were investing back, the Mwales would simply return the Shaws' contribution – even if it meant having to sell a few bottles from their wine collection.

41. The Mwales also represented to the Shaws that the funds they were contributing would be rolled into investments managed by Julius's parent company, Tumaz and Tumaz, which they were told was worth approximately $60 billion.

*The Shaws Agree to Participate in the Investment*

42. Swayed by these promises and assurances, the Shaws agreed to invest in the Mwales' projects.

43. The Shaws made their first monetary contributions to the Mwales on April 4, 2022.

44. By June 22, 2022, the Shaws had paid the Mwales a total of approximately $1.7 million.

*The Shaws Learn the Truth*

45. In August 2022, the Shaws visited Kenya to see the results of their massive investment.

46. The trip to Africa, which included visits to the coast and an African safari, quickly turned south when the Shaws arrived at Julius's purported self-sustaining city.

47. The hospital, previously represented as the world's largest and most advanced, was a complete construction mess – as it had been, the Shaws later learned, for more than five years.

48. Only one wing of the hospital was working, with only a run-down clinic on the first floor, primarily treating children from surrounding schools for malaria.

49. Contrary to Julius's representation, the hospital appeared to have no cancer treatment facility.

50. The hospital was, in short, simply a shell – nothing like what was represented.

51. The contrast between the Mwales' representations and the reality conveyed the clear impression that the hospital was a mere ruse the Mwales used to tell others that Julius had founded a bustling city in Kenya.

52. The golf course, supposedly built on ancestral lands donated by local farmers, was also nothing like what was represented.

53. The course was unfinished. There was no clubhouse, no facilities. In fact, the greens had no holes.

54. Julius also showed the Shaws the rental homes he claimed to have built to generate revenue for the farmers. The homes were little more than vacant 10 x 10 concrete boxes with no facilities.

55. The individuals who worked with the Mwales also turned out to be other than as advertised.

56. Derek William, whose actual name is Derek William Knox, and Christine Allyn – whose actual name is Allyn Knox – are actually Kaila's siblings.

57. This was contrary to the stories relayed by Julius, Kaila, Derek, and Christine.

58. Derek and Christine both live with the Mwales at their San Jose estate.

59. On information and belief, the Shaws now have reason to believe that Derek does not own KE International.

60. Christine, meanwhile, was simply Kofi Annan's granddaughter's nanny.

*The Shaws' Demands to have their Money Returned are Ignored*

61. Alarmed by the contrast between representation and reality, on September 9, 2022, the Shaws asked the Mwales to return the money the Shaws had invested.

62. At the time, the Mwales represented that they would return the Shaws' money after a 60 to 90-day "due diligence" period.

63. The Shaws and Mwales had phone calls roughly every two weeks after that date, with the Mwales continually furnishing excuses for why the money could not be returned.

64. After the Mwales represented that the due diligence period had been extended to 120 "business" days, they gave the Shaws a "worst case" scenario of March 5, 2023, for a return of their money.

65. The Mwales did not return the Shaws' money by March 5, 2023.

66. At that point, it seemed clear to the Shaws that the Mwales scammed the Shaws, misleading them to "invest" roughly $1.7 million in a fraudulent investment scheme.

*"Loan Modification Agreement" and Partial Payments*

67. After the Mwales failed to return the Shaws' money by March 5, 2023, the Shaws and Kaila, through counsel, negotiated a "Loan Modification Agreement" by which Kaila agreed to repay the Shaws' investment money in a series of four installments over a seven-month period.

68. Under the Loan Modification Agreement, Kaila signed confessions of judgment for each installment owed.

69. As Kaila made the promised payments, the Loan Modification Agreement required the Shaws to return to Kaila the corresponding confession of judgment.

70. The final installment of $850,000 was originally due on November 15, 2023.

71. Kaila did not make the promised payment by November 15, 2023.

72. Rather, through her attorney, Kaila requested an extension of the due date of the final installment to January 24, 2024.

73. In exchange for the additional time, Kaila offered to pay an additional $20,000 in interest, making the total final payment $870,000.

74. The Shaws agreed to Kaila's requested modification of the Loan Modification Agreement.

75. Kaila likewise failed to pay any of the then $870,000 installment due by the new January 24, 2024, deadline.

76. Kaila initially requested another extension until March 2024 to make the final payment, in exchange for another $20,000 interest.

77. But after the Shaws indicated their willingness to agree to one final extension, Kaila responded that she would actually need until June 2024 to make the final payment.

78. The Shaws ultimately agreed to this additional extension.

79. Kaila did not make the promised final payment by the June 2024 deadline, and the Shaws believe now she is unlikely to ever make the $870,000 payment.

80. Kaila's confession of judgment for the $850,000 is attached as Exhibit A.

81. A copy of the email from Kaila's counsel agreeing to pay the additional $20,000 in interest (for the extension to January 24, 2024) is attached as Exhibit B.

**CAUSE OF ACTION ONE**
**Fraud**
**(Against All Defendants)**

82. The preceding paragraphs are incorporated by reference and realleged within this Cause of Action.

83. The Mwales made a series of misrepresentations to the Shaws, including but not limited to the following false statements:

    a. The Mwales' representation on February 18, 2022 (and many times thereafter) that they were billionaires;

    b. The Mwales' representation on February 18, 2022 (and many times thereafter) that Julius had built an energy efficient, self-sustaining city in his hometown in Kenya.

    c. Julius's representation on February 18, 2022 (and many times thereafter) that he owned the private jet the Mwales used to fly their family;

10

    d. The Mwales' representation in May 2022 that they owned the San Jose estate they live at (and invited the Shaws to visit);

    e. The Mwales' representation on or around March 18, 2022, that they owned expensive cars worth hundreds of thousands of dollars;

    f. The Mwales' representation on or around March 18, 2022, that they owned a wine collection valued at approximately $250 million;

    g. The Mwales' representation on or around March 18, 2022, that they owned a jewelry collection worth $870 million;

    h. The Mwales' representation on or around March 18, 2022, that the Shaws' investments would generally be put toward building a battery manufacturing plant and surrounding infrastructure;

    i. Julius's representation on or around March 18, 2022, that he had been gifted land that included 12 undeveloped cobalt mines in various parts of Africa, including the DRC, to develop in order to build battery manufacturing plants;

    j. The Mwales' March 18, 2022, representations that local farmers in the area of the self-sustaining African cities Julius was helping to develop had been made millionaires (in U.S. dollars) from the rising value of their nearby land;

    k. The Mwales' March 18, 2022, representation that their programs for their self-sustaining city in Africa included having built a luxury golf course on donated land and having built rental homes on farmers' properties (that the farmers had donated for free), so the farmers could generate rental income;

l. The Mwales' March 18, 2022, representation that they had built the largest, most advanced hospital in the world, with state-of-the-art technology, five thousand beds, and an advanced cancer treatment facility;

m. The Mwales' March 18, 2022, representation that Derek William was a rocket scientist "poached" from Boeing, who supposedly owned KE International;

n. The Mwales' March 18, 2022, representation that Christine Allyn was a former personal assistant for Kofi Annan, a former United Nations Secretary General;

o. Julius's March 18, 2022, representation that KE International was an independent, third-party construction and engineering company that he had awarded the contract to for the purpose of building self-sustaining cities;

p. Julius's representation on or around March 18, 2022, that he would take the Shaws' money as a "loan" with a guaranteed twenty percent per annum return;

q. Julius's representation on or around March 18, 2022, that the Shaws' investment would be rolled into the Mwales' investment with the potential to generate returns of ten times the initial contribution;

r. The Mwales' representation on or around March 18, 2022, that if the Shaws ever wanted the money back that they were investing, the Mwales would simply return the Shaws' contribution – even if it meant having to sell a few bottles from their wine collection;

s. Julius's representation on or around May 20, 2022, that several African countries had gifted him millions of acres of land to help build energy-efficient, self-sustaining cities, similar to the one he claimed to have already built in his hometown in Kenya;

    t. Julius's representation on or around May 20, 2022, that the Shaws' money would be spent on geological surveys in the DRC to build infrastructure that would eventually support a battery manufacturing plant;

    u. The Mwales' representation, on or around May 20, 2022, that the funds the Shaws were contributing would be rolled into investments managed by Julius's parent company, Tumaz and Tumaz, which the Mwales claimed was worth approximately $60 billion;

    v. The Mwales' representation, after the Shaws requested their money back on September 9, 2022, that they would return the money after a 60 to 90-day "due diligence" period;

    w. The Mwales' subsequent representation that the due diligence period had been extended to 120 "business" days, and that they would return the Shaws' money by March 5, 2023, as a "worst case" scenario.

  84. The Mwales knew these representations were false.

  85. The Mwales also omitted material facts from the Shaws, including but not limited to the following:

    a. The hospital in Kenya that the Mwales claimed they had built, previously represented as the world's largest and most advanced, was a construction mess – and it had been for more than five years;

    b. Only one wing of the hospital was functional – a run-down clinic on the first floor, primarily treating children from surrounding schools with malaria;

    c. The hospital had no cancer treatment facility;

    d. The supposed luxury golf course was unfinished – there was no clubhouse, no facilities, and the greens had no holes;

  e. The rental homes the Mwales claimed to have built on farmers' donated land were little more than 10 x 10 concrete boxes with no facilities and no occupants;

  f. Derek William is actually Derek William Knox, one of Kaila's siblings;

  g. Christine Allyn is actually Allyn Knox, another of Kaila's siblings;

  h. Derek and Christine both live with the Mwales at the San Jose estate;

  i. Derek does not own KE International; and

  j. Christine was simply Kofi Annan's granddaughter's nanny (not his personal assistant).

86. The Mwales knew these omissions of fact were material.

87. The Shaws reasonably relied on those misrepresentations and omissions and gave the Mwales approximately $1.7 million.

88. As a direct and proximate result of the Mwales' conduct, the Shaws have been damaged in an amount to be determined at trial, but which includes at a minimum the $870,000 the Mwales still owe to the Shaws.

**CAUSE OF ACTION TWO**
**Negligent Misrepresentation**
**(Against All Defendants)**

89. The preceding paragraphs are incorporated by reference and realleged within this Cause of Action.

90. The Mwales made a series of representations to the Shaws, including but not limited to those representations set forth in paragraph 83 above, with the intent of inducing the Shaws to give money to the Mwales.

91. The Mwales' representations were false.

14

92. The Mwales had no reasonable grounds for believing their misrepresentations were true.

93. The Mwales also unreasonably omitted crucial facts from their communications with the Shaws, including but not limited to the omissions set forth in paragraph 85 above.

94. The Shaws reasonably relied on those representations and gave the Mwales approximately $1.7 million.

95. As a direct and proximate result of the Mwales' conduct, the Shaws have been damaged in an amount to be determined at trial, but which includes at a minimum the $870,000 the Mwales still owe to the Shaws.

## CAUSE OF ACTION THREE
### Breach of Contract
### (Against Kaila Mwale)

96. The preceding paragraphs are incorporated by reference and realleged within this Cause of Action.

97. In an effort to recover their $1.7 investment with the Mwales, the Shaws and Kaila signed the Loan Modification Agreement.

98. Under the Loan Modification Agreement, Kaila agreed to make an installment payment of $850,000 to the Shaws by November 15, 2023.

99. Kaila did not make the required payment.

100. The parties agreed to modify the Loan Modification Agreement by extending the due date of the final installment to January 24, 2024, in exchange for Kaila promising to pay an additional $20,000 interest to the Shaws.

101. Kaila did not make any part of the required $870,000 payment by January 24, 2024.

15

102. The parties thereafter negotiated an extension of the $870,000 payment to June 2024.

103. Kaila's failure to make the required $870,000 payment constitutes a breach of contract.

104. As a result of Kaila's breach, the Shaws have suffered damages in amount not less than $870,000 plus interest, pre- and post-judgment costs of collection, the precise amount to be determined at trial.

## CAUSE OF ACTION FOUR
## Unjust Enrichment
## (Against Julius Mwale and in the alternative to Kaila Mwale)

105. The preceding paragraphs are incorporated by reference and realleged within this Cause of Action.

106. The Mwales received a benefit from the Shaws in the form of the approximately $1.7 million conveyed by the Shaws.

107. The Shaws' conveyance of this benefit to the Mwales was to their own detriment, in that it deprived them of the monies so conveyed.

108. The circumstances of this case are such that it would be unjust for the Mwales to retain the benefit conveyed by the Shaws without paying for the benefit.

109. Equity demands that the Shaws be compensated for the benefit they conferred upon the Mwales by the return of at least $870,000 so conveyed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

a) Actual and consequential damages in an amount to be proven at trial;

b)   Pre- and post-judgment interest; and

c)   Any other relief warranted by law and/or which the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims triable to a jury.

Dated: July 19, 2024

                                        **DENTONS DURHAM JONES PINEGAR**

                                        /s/ *Aaron B. Clark*
                                        Aaron B. Clark
                                        Trinity Jordan

                                        *Attorneys for Plaintiffs*