Jenifer L. Tomchak (10127) (jen.tomchak@tomchaklaw.com)
Nicole A. Skolout (10223) (nicole.skolout@tomchaklaw.com)
TOMCHAK SKOLOUT
10 West 100 South, Suite 700
Salt Lake City, Utah 84101
Telephone:  (801) 831-4820

*Attorneys for Defendants Julius Mwale and Kaila Mwale*

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

---

| | |
|---|---|
| MATHEW SHAW and BROOKE SHAW,<br><br>Plaintiffs,<br><br>vs.<br><br>JULIUS MWALE and KAILA MWALE,<br><br>Defendants. | **DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF NEW YORK**<br><br>Case No. 1:24-cv-00122-AMA-DAO<br><br>Judge Ann Marie McIff Allen<br><br>Magistrate Judge Daphne A. Oberg |

Defendants Julius Mwale and Kaila Mwale (the "Mwales") hereby move the Court pursuant to Fed. R. Civ. P. 12(b)(2) to dismiss all claims against them because this Court lacks personal jurisdiction over them.  In the alternative, the Mwales request that, pursuant to 28 U.S.C. §1404(a), the Court transfer this action to the United States District Court for the Southern District of New York ("Southern District of New York") because the forum selection clauses in the Loan Modification Agreement and related Release Agreement mandate that the Southern District of New York is the "exclusive venue" for resolving any disputes among Plaintiffs Mathew Shaw and Brooke Shaw (the "Shaws") and the Mwales.

1

# INTRODUCTION

The Shaws and Mwales previously agreed to resolve the disputes between them after the Shaws threatened in April 2023 to file a complaint against the Mwales in the District of Utah. To avoid litigation, the Shaws and Mwales, both represented by experienced counsel, negotiated and entered into a Loan Modification Agreement and related Release Agreement.  In that Release Agreement, the Shaws agreed to release all claims against the Mwales, including those contained in the proposed lawsuit that they had threatened to file, and further agreed that the Release Agreement could be raised as and would constitute a complete bar to any such claim or action they later brought against the Mwales.  Importantly, both the Loan Modification Agreement and Release Agreement contain a choice-of-law clause mandating that New York law governs the validity, construction, enforcement, and interpretation of those Agreements; a forum selection clause mandating that the "exclusive venue" for "any dispute" between the Shaws or Mwales is the Southern District of New York; and a provision expressly stating that nothing in those Agreements may be construed as the Mwales consenting to personal jurisdiction in Utah.

Despite the Shaws' release of claims—and the clear provisions mandating that the Southern District of New York is the "exclusive venue" to resolve any disputes—the Shaws nonetheless elected to flout the terms of those Agreements and recently filed this lawsuit against the Mwales.  The only substantive difference between the Shaws' original draft complaint and the one they ultimately filed is that they now include a claim for breach of the Loan Modification Agreement, in addition to the claims they originally intended to assert for fraud, negligent misrepresentation, and unjust enrichment.  While the Mwales maintain and assert that the Shaws' claims for fraud, negligent misrepresentation, and unjust enrichment have already been released

and are barred (and will assert many other defenses to the blatantly false and misleading allegations made by the Shaws), this Court is not the proper forum to resolve these issues or whether the Loan Modification Agreement has been breached.

First, the Court does not have personal jurisdiction over the Mwales. The Mwales are New York residents and have virtually no contacts with Utah. They have only visited the state one time for a week in February 2022 to take their kids skiing and visit a friend. They do not own any property in Utah, do not have any business interests in Utah, and do not conduct any business in Utah. Moreover, virtually all of the allegations that form the basis for the Shaws' claims in this case relate to activities that took place in California, not Utah. Given that the Mwales do not have even minimum contacts with Utah and the claims asserted in this case bear little connection Utah, other than the fact that the Shaws reside here, the Court does not have personal jurisdiction over the Mwales. Accordingly, this lawsuit should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

Second, if the Court does not dismiss this case for lack of personal jurisdiction, it must transfer this case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). The Supreme Court has held that where, as is the case here, a valid forum selection clause points to a federal jurisdiction, that forum selection clause should be enforced by transferring the case to that federal jurisdiction. *See Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 59 (2013). Because the forum selection clauses in the Loan Modification Agreement and Release Agreement are valid and apply to the parties and claims at issue in this case, this Court must transfer it to the Southern District of New York if it is not dismissed for lack of personal jurisdiction.

## SUMMARY OF RELEVANT ALLEGATIONS IN COMPLAINT

### A. **Personal Jurisdiction**.

The Shaws allege that "[t]he Court has specific personal jurisdiction over [the Mwales] because, as set forth in the allegations below, [the Shaws'] claims rise from [the Mwales'] contacts and activities in the State of Utah, including but not limited to directing fraudulent representations toward [the Shaws] in Utah." [ECF No. 1, Compl., ¶ 6.] Despite this allegation, the only facts plead regarding Utah in the Complaint, other than that the Shaws are residents, are that the Shaws met the Mwales at a dinner in Holladay, Utah on February 18, 2022, where they "made an immediate connection" and the Mwales purportedly told them that they were billionaires, owned a private jet, and that Julius Mwale had built "an energy efficient, self-sustaining city in his hometown in Kenya." [Compl., ¶¶ 1–2, 8–11, 15, 83(a)-(c).] Instead, nearly all of the allegations that form the basis for their claims in this case and that purportedly led them to invest in the Mwales' projects relate to activities, and in particular meetings, that took place in California. For example, the Shaws allege that they visited the Mwales in San Jose, California on "several occasions";[1] that on or around the March 18, 2022 meeting in San Jose, California, "the Mwales were pushing the Shaws to contribute to a series of investment opportunities run by Julius [Mwale];"[2] that during the March 18, 2022 meeting in San Jose,

---

[1] These visits were actually to Alamo, California, which is near San Jose. [*See* Julius Mwale Decl., ¶¶ 16–17, attached as Ex. 1.; Kaila Mwale Decl., ¶¶ 16–17, attached as Ex. 2.] Further, while not addressed in the Complaint, the Shaws are the ones who asked to the Mwales if they could visit them in California. [*See* Ex. 1, ¶¶ 16–17; Ex. 2, ¶¶ 16–17.]

[2] The Mwales vehemently deny many of the allegations in the Complaint, including that they ever "push[ed]" the Shaws to invest in their projects. Instead, the Shaws pursued the Mwales and sought to invest in their projects. However, since all well-pleaded factual allegations in the

California, "the Mwales represented that the Shaws' investments would generally be put toward building a battery manufacturing plant and surrounding infrastructure"; and that at that same March 18, 2022 meeting in San Jose, California, the Mwales made all the "claims" set forth in Paragraph 29 through 41 of the Complaint, and that based on those "promises and assurances," the Shaws "agreed to invest in the Mwales' projects" and did invest approximately $1.7 million in those projects.[3]  [Compl., ¶¶ 16, 18, 24–44, 83(d)-(r).]

**B.  Venue.**

The Shaws allege that venue is proper in the District of Utah "pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to [the Shaws'] claims occurred in this judicial district."  [Compl., ¶ 7.]  Contrary to this conclusory allegation, as set forth in Section A, *supra*, in the Complaint, only one event—the dinner where the Shaws met the Mwales—is alleged to have taken place in Utah.

**C.  Causes of Action.**

The Shaws allege that the Mwales made misrepresentations and omissions that the Shaws relied on in giving approximately $1.7 million to the Mwales, and that they suffered damages in the amount no less than the $870,000 they claim the Mwales still owe them.  [Compl., ¶¶ 22–44, 82–95.]  The Shaws plead the following causes of action against the Mwales in the Complaint:

---

Complaint must be accepted as true at this stage of the case, the Mwales do not specifically address these false claims in this Motion or their Declarations, but reserve the right to do so at a later time.

[3] The Shaws also claim that the Mwales made other representations during a May 20, 2022 meeting that they relied on.  [Compl., ¶¶ 26–27, 83(s)-(u).]  While the location of that meeting is not identified in the Complaint, that meeting also took place in Alamo, California. [Ex. 1, ¶ 17; Ex. 2, ¶ 17.]

(1) fraud; (2) negligent misrepresentation; (3) breach of contract (against Kaila Mwale only); and (4) unjust enrichment. [*Id.*, ¶¶ 82–109.] The contract that the Shaws claim was breached is the Loan Modification Agreement, which the Shaws claim they entered into in an effort to recover their $1.7 million investment. [*Id.*, ¶¶ 67–79, 96–104.] The Shaws claim only that a single payment under the Loan Modification Agreement was not made. [*Id.*, ¶ 67–71.]

## FACTUAL BACKGROUND

### A. Loan Modification Agreement and Release Agreement.

On April 10, 2023, the Shaws threatened to file an almost identical action to this one against the Mwales, even going so far as to transmit a draft complaint to be filed in the District of Utah, which purported to assert claims against the Mwales for fraud, negligent misrepresentation, and unjust enrichment. [April 10, 2023 Email attaching Draft Compl., attached as Ex. 3.] Subsequently, on April 27 and 28, 2023, the Shaws and the Mwales resolved their disputes by entering in the Loan Modification Agreement and Release Agreement (which is attached as Exhibit A to the Loan Modification Agreement),[4] which was negotiated by experienced counsel on both sides. [*See* Loan Modification Agreement, attached as Ex. 4.][5] In

---

[4] The Loan Modification Agreement is signed by Mathew Shaw and Kaila Mwale, but references their spouses throughout. The Release Agreement is signed by Mathew Shaw, Brooke Shaw, Julius Mwale, and Kaila Mwale.

[5] The Mwales are seeking leave to file the unredacted version of the Loan Modification Agreement under seal out of an abundance of caution. The Confidentiality and Non-Disparagement Agreement among the Shaws and Mwales is also attached to the Loan Modification Agreement as an exhibit. In that Agreement, they agreed to keep the existence and terms of the Loan Modification Agreement confidential, subject to certain exceptions. In their Complaint, the Shaws make numerous allegations concerning the Loan Modification Agreement and identify a number the terms. The Mwales only recite provisions of the Loan Modification Agreement and Release Agreement herein as necessary to bring this Motion.

the Loan Modification Agreement, the parties agreed to settle any "Claims" that the Shaws may have against the Mwales in exchange for the Mwales making four payments to the Shaws, [Ex. 4, ¶ 3(a)-(f)], the "Claims" being defined as "any and all causes of action contained in the Proposed Action" (meaning the draft complaint transmitted to the Mwales), as well as:

> any other causes of action, promissory notes, debts, suits, sums of money, accounts, liabilities, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions, obligations, taxes, costs and expenses, claims, or demands whatsoever vis-à-vis any and all Parties, in law or equity, which the Parties might now have, own or hold, or at any time heretofore ever had, owned, or held, or could, shall, or may have, own, or hold, whatsoever against the other Parties, upon or by reason of any matter, cause or thing, act or omission, or circumstance whatsoever, or any other claims, asserted benefits, or rights arising by or under contract or implied contract, tort, negligence, statute, or other legal or equitable theory of recovery, whether known or unknown, at any time prior to the date of this Agreement.

[*Id.* at 1, ¶ 1(d).] Further, the Loan Modification Agreement sets forth the exclusive mechanism—enforcing the Confessions of Judgment signed and delivered by Kaila Mwale pursuant to that Agreement—for the Shaws to recover any money owed under the Agreement in the event any payment due is not timely made.[6] [Ex. 4, ¶ 3(g).]

The Release Agreement provides that "the Shaws release and forever discharge the Mwales, individually and collectively, from any and all Claims as defined in this Agreement." [Ex. 4 (Ex. A), ¶ 3(a).] "Claims" has the same definition as in the Loan Modification Agreement, and includes the claims alleged in the draft complaint (fraud, negligent

---

[6] In their Complaint, the Shaws allege that only a single payment due under the Loan Modification Agreement was not made and acknowledge the existence of the Confessions of Judgment (and even attach one as an exhibit). [Compl., ¶¶ 67–81.] However, instead of filing and seeking to enforce the Confession of Judgment pertaining to that payment as contemplated under the Loan Modification Agreement, they elected to ignore the Agreement and pursue this lawsuit in the District of Utah, unnecessarily burdening this Court and wasting judicial resources.

misrepresentation, and unjust enrichment) that the Shaws threatened to file in the District of Utah in April 2023.  [*Id.*, ¶ 1(d).]  The Release Agreement further states that the Parties agree that they will not "file any future charge or complaint nor institute any legal action or proceedings at law or in equity related to the Claims released in this Release Agreement" and that if any such charge or complaint is filed by a Party, "that Party hereby waives any right to any monies herein or damages from such action or proceeding."  [*Id.*, ¶ 3(e).]  Finally, the Release Agreement provides:

> If any Party should, after the execution of this Release Agreement, make, pursue, prosecute, or threaten to make any Claim or allegation, or pursue or commence or threaten to commence any Claim, action, complaint or proceeding against the other Parties for or by reason of any cause, matter or thing whatsoever existing up to the present time, ***this Release Agreement may be raised as and shall constitute a complete bar to any such Claim, allegation, action, complaint or proceeding***.

[*Id.*, ¶ 5 (emphasis added).]

Both the Loan Modification Agreement and Release Agreement contain a "Jurisdiction" provision consisting of a choice-of-law clause (New York law), forum selection clause (Southern District of New York), and provision stating that nothing in the Agreements may be construed as the Mwales consenting to personal jurisdiction in Utah:

> The substantive laws of the State of New York shall govern the validity, construction, enforcement, and interpretation of this Agreement and ***exclusive venue for any dispute between the parties shall be brought in the United States District Court for the Southern District of New York***. <u>Nothing herein shall be construed as any of [the Mwales] consenting to personal jurisdiction in the State of Utah.</u>

[Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8 (emphasis added).][7]

---

[7] The clause is virtually the same in both Agreements, except that the Loan Modification Agreement refers to the Mwales as "the Debtor or her spouse" instead of by name.

**B.  The Mwales' Lack of Contacts With Utah.**

Julius Mwale is a citizen of Kenya and primarily resides in New York when he is in the United States.  [Ex. 1, ¶ 1.]  Kaila Mwale is a citizen of the United States and primarily resides in New York when she is in the United States.  [Ex. 2, ¶ 1.]  The Mwales also have a residence in California.  [Ex. 1, ¶ 3; Ex. 2, ¶ 3.]

The Mwales have only visited Utah one time for a week, from February 17–24, 2022.  [Ex. 1, ¶ 6; Ex. 2, ¶ 6.]  The Mwales traveled to Utah for a ski vacation with their children and to visit their friend, Gordon Bowen ("Bowen").  [Ex. 1, ¶ 7; Ex. 2, ¶ 7.]  During this visit, Bowen invited the Mwales and their children to have dinner at his home on February 18, which is where they met the Shaws for the first time.  [Ex. 1, ¶ 9; Ex. 2, ¶ 9.]  Because they had just met, the Mwales told the Shaws generally about their lives and work and the Shaws did the same.  [Ex. 1, ¶ 9; Ex. 2, ¶ 9.]  At the end of the evening, the Shaws invited the Mwales and their children to join them the next afternoon to see how they record their music videos.  [Ex. 1, ¶ 10; Ex. 2, ¶ 10.]  After skiing on February 19, the Mwales took their children to watch the music video production.  [Ex. 1, ¶ 11; Ex. 2, ¶ 11.]  Afterward, the Shaws and the Mwales and their families, along with some of the video production crew, went for pizza nearby.  [Ex. 1, ¶ 12; Ex. 2, ¶ 12.]  In addition, at the invitation of Mathew Shaw, the Mwales and their children had lunch with him and his son on February 23.  [Ex. 1, ¶ 13; Ex. 2, ¶ 13.]  During this trip to Utah, the Mwales casually and generally discussed some projects they were working on in Africa when talking about their lives and work; however, the Shaws and the Mwales never discussed the possibility of the Shaws becoming involved in or investing in any of those projects. [Ex. 1, ¶ 15; Ex. 2, ¶ 15.]

The Mwales do not own any property in Utah, do not have business interests in Utah, and do not conduct any business in Utah.  [Ex. 1, ¶¶ 4–5; Ex. 2, ¶¶ 4–5.]

## LEGAL STANDARD

"The Federal Rules of Civil Procedure allow a defendant to move for dismissal of a complaint based on 'lack of personal jurisdiction.'"  *XMission, L.C. v. PureHealth Research*, 105 F.4th 1300, 1306–07 (10th Cir. 2024) (quoting Fed. R. Civ. P. 12(b)(2)).  "A district court has discretion to resolve such a motion in a variety of ways – including by reference to the complaint and affidavits . . ."  *Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1069 (10th Cir. 2008).  "Conclusory allegations . . . need not be credited by this court and 'will not suffice to defeat a Fed. R. Civ. P. 12(b) motion.'"  *Dental Dynamics, LLC v. Jolly Dental Group, LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020) (quoting *Dudnikov*, 514 F.3d at 1073).  "[P]laintiffs bear the burden of establishing personal jurisdiction."  *Dudnikov*, 514 F.3d at 1069.

Further, a defendant may move to transfer a case pursuant to 28 U.S.C. § 1404(a) where an applicable forum selection clause points to a particular federal district court.  *See Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 59 (2013) ("Section 1404(a) . . . provides a mechanism for enforcement of forum-selection clauses that point to a particular federal district.").  Section 1404(a) provides in pertinent part that "a district court may transfer any civil action . . . to any district or division to which all parties have consented."

## ARGUMENT

### A.  The Court Does Not Have Personal Jurisdiction Over the Mwales.

"'To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the

exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment.'" *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) (quoting *TH Agric. & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282, 1286–87 (10th Cir. 2007)).  Utah's long-arm statute provides that its provisions "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."  Utah Code § 78B-3-201(3). "This collapses the Utah standard into the more general 'due process' standard for jurisdiction." *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

"The Due Process Clause authorizes personal jurisdiction if two elements are met." *Dental Dynamics, LLC v. Jolly Dental Group, LLC*, 946 F.3d 1223, 1229 (10th Cir. 2020). "First, a defendant must have 'purposefully established minimum contacts within the forum state.'" *Id.*  (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "This minimum-contacts standard may be satisfied by showing general or specific jurisdiction.'" *Employers Mut. Cas. Co.*, 618 F.3d at 1160.  "Second, the assertion of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Dental Dynamics*, 946 F.3d at 1229 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

### 1.   The Mwales Do Not Have Continuous and Systematic Contacts With Utah That Would Permit the Exercise of General Jurisdiction Over Them.

"General jurisdiction arises where the defendant[s'] contacts with the forum state are 'so continuous and systematic as to render them essentially at home' there." *C5 Med. Werks v. CeramTec GmbH*, 937 F.3d 1319, 1323 (10th Cir. 2019) (bracket omitted) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  The Shaws do not allege any facts in the Complaint which would show that Utah has general personal jurisdiction over the

Mwales and, in fact, only allege that "specific personal jurisdiction" exists.  [*See* Compl., ¶ 6.] The Mwales have visited Utah only once for a week on a ski trip and do not own any property in Utah, do not have any business interests in Utah, and do not conduct any business in Utah.  [Ex. 1, ¶¶ 4–7; Ex. 2, ¶¶ 4–7.]  Accordingly, the Mwales plainly do not have "continuous and systematic" contacts with Utah that would permit the exercise of general jurisdiction over them.

> **2.  The Mwales Do Not Have Minimum Contacts With Utah That Would Permit the Exercise of Specific Jurisdiction Over Them.**

"Specific jurisdiction means that a court may exercise jurisdiction over an out-of-state party only if the cause of action relates to the party's contacts with the forum state."  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017).  "The minimum contacts test for specific personal jurisdiction has two requirements: (1) a defendant must have 'purposefully directed its activities at residents of the forum state,' and (2) the plaintiff's injuries must arise out of the defendant's forum-related activities."  *Dental Dynamics*, 946 F.3d at 1229 (quoting *Old Republic*, 877 F.3d at 904).

> **a.  The Mwales Did Not Purposefully Create Any Contacts With Utah or Avail Themselves of the Privilege of Conducting Activities in the State.**

> > i.  <u>Tort Claims</u>

When analyzing tort claims, such as the Shaws' fraud and negligent misrepresentation claims, the Court must examine "'the harmful effects [of the Mwales' conduct] in the forum state' to assess purposeful direction."  *Dental Dynamics*, 946 F.3d at 1231 (quoting *Old Republic*, 877 F.3d at 905).  "Purposeful direction in this context has three elements: (1) an intentional action; (2) expressly aimed at the forum state; and (3) with knowledge that the brunt of the injury would be felt in the forum state."  *Id.*

"'For a [s]tate to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a **substantial connection** with the forum [s]tate.'" *Anzures v. Flagship Rest. Group*, 819 F.3d 1277, 1280 (10th Cir. 2016) (emphasis added) (bracket and emphasis removed) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)); *see also Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 979 (10th Cir. 2022) (indicating that "'the forum state itself must be the focal point of the tort'" (quoting *Dudnikov*, 514 F.3d at 1074 n.9 (internal quotation marks omitted)). Critically, "the relationship between a defendant and the forum [s]tate 'must arise out of contacts that the defendant himself creates with the forum [s]tate,' and **those contacts must be 'with the forum [s]tate itself, not the defendant's contacts with persons who reside there,'** such as a plaintiff." *Anzures*, 819 F.3d at 1280 (emphasis added) (quoting *Walden*, 571 U.S. at 284–85 (internal quotation marks and emphasis omitted)). "Thus, 'a plaintiff's contacts with the forum [s]tate cannot be decisive in determining whether the defendant's due process rights are violated.'" *Anzures*, 819 F.3d at 1280 (quoting *Walden*, 571 U.S. at 285 (internal quotation marks omitted)). "[T]he mere fact that [a defendant's] conduct affected plaintiffs with connections to the forum [s]tate does not suffice to authorize jurisdiction.'" *Anzures*, 819 F.3d at 1280 (quoting *Walden*, 571 U.S. at 285). Instead, "'[d]ue process requires that a defendant be haled into court in a forum [s]tate based on his own affiliation with the [s]tate, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the [s]tate.'" *Anzures*, 819 F.3d at 1280–81 (quoting *Walden*, 571 U.S. at 285 (internal quotation marks omitted)).

The Mwales have not purposefully created any contacts with Utah or aimed any activity at it, and the Shaws do not and cannot allege otherwise in the Complaint. The only contact with

Utah that the Shaws allege in the Complaint is that the Mwales attended a dinner in Holladay, Utah where they met the Shaws for the first time and the Mwales purportedly told them that they were billionaires, owned a private jet, and that Julius Mwale had built an energy-efficient city in his hometown.  [Compl., ¶¶ 8–11, 15, 83(a)–(c).]  This is, in fact, the only time that the Mwales have visited Utah—the purpose of which was to take their children skiing and to visit a friend. [Ex. 1, ¶¶ 6–7; Ex. 2, ¶¶ 6–7.]  Moreover, when the Mwales met the Shaws in Utah on that visit, they did not discuss or raise the issue of the Shaws potentially becoming involved in or investing in their projects.  [Ex. 1, ¶ 15; Ex. 2, ¶ 15.]  Indeed, the Shaws themselves allege that that nearly all of the purported representations that they relied on in deciding to invest in the Mwales' projects were made by the Mwales when the Shaws visited them at their home in California. [*See* Compl., ¶¶ 24–44, 83(d)-(u); *see also* Ex. 1, ¶¶ 16–17; Ex. 2, ¶¶ 16–17.]

At best, the Shaws can claim that the Mwales' alleged tortious conduct affected and injured them in Utah because they are Utah residents.  However, under *Walden*, *Anzures*, and other controlling Tenth Circuit case law, that is plainly insufficient to establish purposeful direction.  *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."); *Anzures*, 819 F.3d at 1281 ("[D]efendants' suit-related conduct did not create any meaningful contacts with Colorado itself, and the fact that [plaintiff] was affected in Colorado (because he resides there) is insufficient to authorize personal jurisdiction over defendants."); *Eighteen Seventy*, 32 F.4th at 970 ("[A] defendant's knowledge of *a plaintiff's* connection to a forum state, without more, cannot establish express aiming towards the forum state." (emphasis in original)).

The Court cannot look at the fact the Shaws have a substantial connection to Utah in deciding whether exercising personal jurisdiction over the Mwales comports with due process; instead, it must look at the contacts, if any, that the Mwales purposefully created with, or the activity it aimed at, Utah to make that determination. Using that framework, it is readily apparent that the Mwales did not purposefully create any contacts with Utah or aim any activity at Utah such that the Court can exercise jurisdiction over them consistent with due process.[8]

ii. <u>Contract Claim</u>

Analyzing purposeful direction with respect to the Shaws' breach of contract claim requires the Court to look at whether the Mwales "'purposefully availed [themselves] of the privilege of conducting activities or consummating a transaction in the forum state.'" *Anzures*, 819 F.3d at 1282 (quoting *Dudnikov*, 514 F.3d at 1071 (internal quotation marks omitted)). "[A]n out-of-state resident's contract with a resident of the forum state is insufficient, standing alone, to create personal jurisdiction." *Dental Dynamics*, 946 F.3d at 1230.

Here, the Mwales did not establish any relationship with Utah or purposefully avail itself of the privilege of conducting any activity in Utah when entering into the Loan Modification Agreement that is the subject of the Shaws' breach of contract claim. The Loan Modification

---

[8] The Shaws also allege that Julius Mwale sent certain text messages, videos, and contracts with "prominent companies" to the Shaws. [Compl., ¶¶ 12–14.] While not alleged in the Complaint, at least some of those communications were presumably received by the Shaws in Utah. Even if that is the case, those types of communications are not sufficient to establish any type of purposeful activity aimed at Utah. *See Dental Dynamics*, 946 F.3d at 1231 ("'Ordinarily use of the mails, telephone, or other international communications simply do not qualify as purposeful activity.'" (quoting *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988) (internal quotation marks omitted)). Moreover, the Shaws do not allege that they relied on any of these communications in deciding to invest in the Mwales' projects. [*See* Compl., ¶¶ 82–95.]

Agreement provides for the payment of money to the Shaws over the course of a few months [Ex. 4, ¶ 3(c)–(f)]—it does not contemplate any type of ongoing business relationship between the parties, let alone an ongoing relationship involving Utah.  *See Dental Dynamics*, 946 F.3d at 1230 (finding no purposeful availment where the transactions at issue "concerned the isolated sale or prospective sale of a piece of dental equipment without any long-term or continuing obligations involving [the forum state]").  Further, the Loan Modification Agreement and Release Agreement expressly provide that those Agreements will be construed under New York law.  *See Anzures*, 819 F.3d at 1282 (finding that the defendant did not purposefully avail itself of the privilege of conducting activities in Nebraska where, among other things, the "operating agreement—the contract at issue in [the plaintiff's] breach-of-contract claim—would be construed under Nevada law"); *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 n.7 (10th Cir. 1995) (indicating that choice-of-law provision implicating "the law of another jurisdiction . . . is . . . relevant in assessing the parties' relationship and expectations").  Moreover, the Shaws and the Mwales agreed that nothing in those Agreements would be "construed as any of [the Mwales] consenting to personal jurisdiction in the State of Utah."  [Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8.]  Given these facts, it plainly would not comport with due process for the Court to exercise personal jurisdiction over the Mwales with respect to the Shaws' breach of contract claim.

### b. The Shaws' Claims Do Not Arise Out of the Mwales' Virtually Non-Existent Contacts With Utah.

To satisfy the minimum contacts test, the Court must also find that "'a nexus exists between the Defendant['s] forum-related contacts and the Plaintiff's cause of action.'" *Employers Mut.*, 618 F.3d at 1160 (quoting *TH Agric. & Nutrition*, 488 F.3d at 1291).  Here, there is no such "nexus."  As addressed above, the Mwales have virtually no contacts with Utah.

The only contact that the Mwales have with Utah is that they visited the state for week when on a ski trip in February 2022.  The fact that the Mwales met the Shaws for the first time at a dinner while on that Utah trip, "made an immediate connection" with them, and purportedly told them they were billionaires, owned a private jet, and that Julius Mwale had built a self-sustaining city in his hometown is of little import.  [*See* Compl., ¶¶ 8–11, 15, 83(a)–(c).]  The Mwales and Shaws did not discuss any potential involvement or investments in the Mwales' projects when they first met in Utah, [Ex. 1, ¶ 15; Ex. 2, ¶ 15], and almost all of the alleged representations that the Shaws claim they relied on when deciding to invest in the Mwales' projects were made in California, not Utah.  [*See* Compl., ¶¶ 24–44, 83(d)-(u).]  Thus, there is simply no nexus between the Shaws' claims and the Mwales' lone trip to, and very limited contact with, Utah.

### 3. Exercising Personal Jurisdiction Over the Mwales in This Case Would Offend Traditional Notions of Fair Play and Substantial Justice.

Even if the minimum contacts test is met—which it clearly is not in this case—the Court still "must then assess whether exercising personal jurisdiction would offend traditional notions of fair play and substantial justice." *Dental Dynamics*, 946 F.3d at 1229.  In doing so, the Court must consider the following factors:

> (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies.

*Id.* (citing *Old Republic*, 877 F.3d at 909).  These factors do not support the exercise of personal jurisdiction over the Mwales in this case.

- First, the Mwales would suffer a substantial burden if forced to litigate this case in Utah.  *See OMI Holdings v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1096 (10th Cir. 1998)

("[T]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction.").  The Mwales have no connection to Utah—a state they have only visited once for a week and where they do not own property or have any business interests.  *See Dental Dynamics*, 946 F.3d at 1232 ("Defending an action in Oklahoma despite having no business dealings, property, or offices there is burdensome.").

- Second, Utah does not have any particular interest in resolving this dispute. While the Shaws may be residents of Utah, they voluntarily agreed to resolve their disputes with the Mwales in the Southern District of New York pursuant to New York law.  Indeed, the contract forming the basis of the Shaws' breach of contract claim—the Loan Modification Agreement—contains a choice-of-law provision which provides that any disputes concerning that Agreement will be governed by New York law and that the "exclusive venue" for resolving any disputes between the Shaws and Mwales is the Southern District of New York.  [Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8.]  Further, in the Release Agreement, the Shaws released the fraud, negligent misrepresentation, and unjust enrichment claims that they now assert against the Mwales in this case.  The Release Agreement is a defense and bar to the claims the Shaws assert in this case [*see* Ex. 4 (Ex. A), 1(d), 3(a) & (e), 5], and therefore, the same choice-of-law clause (New York law) and forum selection clause (Southern District of New York) in the Release Agreement apply to those claims.[9]

---

[9] Even if the Shaws dispute the validity or applicability of the release provisions to the claims they assert in this case, they cannot just ignore the existence of the Release Agreement or its provisions.  The release and other provisions of the Release Agreement (and Loan Modification Agreement) are valid and binding on the Shaws unless and until they are able to demonstrate otherwise.

- Third, the Shaws can plainly receive effective relief in a federal district court in New York—to the extent there is any basis for their claims in the first place—and have already agreed to do so.

- Fourth, Utah is not the most efficient state to litigate this dispute.  "Key to this inquiry are the location of witnesses, [] where the wrong underlying the lawsuit occurred, [] what forum's substantive law governs the case, [] and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings*, 149 F.3d at 1097.  Two of the four key witnesses in this case—the Mwales—are located in New York.  Further, the Shaws allege in their Complaint that nearly all of the purported wrongs underlying their lawsuit—including the alleged misrepresentations that they claim led them to invest in the Mwales' projects—occurred in California, not Utah.  [*See* Compl., ¶¶ 24–44, 83(d)-(u).]  Moreover, as addressed above, New York law applies to the Shaws' breach of contract claim, and New York law also governs whether they released the other claims they asserted in this lawsuit since that issue requires interpreting the Release Agreement.  Finally, there are no other pending cases between the Shaws and the Mwales, so piecemeal litigation is not a concern.

- Fifth, no fundamental social policies are implicated by this case, let alone any that would favor litigating this case in Utah.

### B.  If the Court Does Not Dismiss This Case for Lack of Personal Jurisdiction, It Must Transfer This Case to the Southern District of New York.

The mandatory forum selection clauses contained in the Loan Modification Agreement and related Release Agreement (attached as Exhibit A to the Loan Modification Agreement) govern all claims that the Shaws assert in this dispute.  Accordingly, and for the reasons addressed below, the Court must, if it does not dismiss this case for lack of personal jurisdiction,

transfer it to the Southern District of New York—the forum that those Agreements designate as the "exclusive venue" for the resolution of any disputes between the Shaws and the Mwales.

### 1. The Forum Selection Clauses Are Valid.

Both the Loan Modification Agreement and the Release Agreement (attached to the Loan Modification Agreement as Exhibit A), provide that the "***exclusive venue for any dispute between the parties shall be brought in the United States District Court for the Southern District of New York***."  [Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8 (emphasis added).]

Forum selection "clauses are *prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances," (*Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1346 (10th Cir. 1992)), or where the clause was procured through "fraud or overreaching."  *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972).  However, "'[a] plaintiff seeking to avoid a [forum selection] provision on a fraud theory must . . . plead fraud going to the specific provision.'"  *Niemi v. Lasshofer*, 770 F.3d 1331, 1351–52 (10th Cir. 2014) (quoting *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 960 (10th Cir. 1992)).

In the Complaint, the Shaws assert a breach of contract claim against Kaila Mwale for breach of the Loan Modification Agreement, which includes the Release Agreement as an attachment.  [Compl., ¶¶ 96–104; *see also* Ex. 4 (Ex. A).]  In so doing, they are plainly admitting that that the Loan Modification Agreement is valid and binding.  Moreover, while they assert a claim of fraud against the Mwales, those fraud claims relate to events that occurred prior to the execution of the Loan Modification Agreement in April 2023.  [*See* Compl., ¶¶ 82–88.]  There are no allegations in the Complaint that the Loan Modification Agreement—negotiated through

experienced counsel on both sides—let alone the forum selection clause in that Agreement or the attached Release Agreement, were in any way procured through fraud, as would be required to dispute the validity of those clauses.  Accordingly, the forum selection clauses in the Loan Modification Agreement and Release Agreement are clearly valid and should be enforced.

**2.  The Claims Asserted in This Case Fall Within the Scope of the Forum Selection Clauses.**

In this case, the Shaws assert a claim for breach of contract against Kaila Mwale and claims for fraud, negligent misrepresentation, and unjust enrichment against both Julius and Kaila Mwale.  The forum selection clauses in both the Loan Modification Agreement and Release Agreement are broad, mandating that the "exclusive venue" for "***for any dispute between the parties***" is the Southern District of New York.  [Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8 (emphasis added).]  The "parties" to the Loan Modification Agreement are Mathew Shaw and Kaila Mwale and the "parties" to the Release Agreement are Mathew and Brooke Shaw and Julius and Kaila Mwale.  [Ex. 4, ¶ 1(a)–(c); Ex. 4 (Ex. A), ¶ 1(a)–(c).]  Thus, the applicable forum selection clauses cover all the plaintiffs and defendants in this case, and under the broad language of the forum selection clause, encompass all of the claims asserted by the Shaws in this case.

Moreover, even if the language of the forum selection clauses is interpreted in a more limited manner—to only apply to claims implicating the "validity, construction, enforcement, and interpretation" of those Agreements given the presence of that language in the preceding clause—all of the causes of action asserted by the Shaws nevertheless still fall within the scope of the forum selection clauses.  First, the breach of contract claim asserted against Kaila Mwale for the alleged breach of the Loan Modification Agreement is encompassed within the forum

selection clause of that Agreement since that claim undoubtedly implicates the validity, construction, enforcement, and interpretation of that Agreement.  Second, the fraud, negligent misrepresentation, and unjust enrichment causes of action that the Shaws assert in this case fall within the scope of the Release Agreement's forum selection clause.  In the Release Agreement, the Shaws agreed to release these exact same claims against the Mwales.  In April 2023, the Shaws had originally threatened to file a lawsuit asserting claims for fraud, negligent misrepresentation, and unjust enrichment in the District of Utah, [*see* Ex. 3], but the Shaws and Mwales resolved their disputes by entering into the Loan Modification Agreement and Release Agreement.  In the Release Agreement, the Shaws agreed to release all claims against the Mwales, including those asserted in the proposed action they had threatened to file in April 2023. [*See* Ex. 4 (Ex. A), ¶¶ 3(a), 1(d).]  The Shaws further agreed in the Release Agreement that they would not institute any legal action relating to the released claims, and that if they did, that the "Release Agreement may be raised as and shall constitute a complete bar to any such Claim, allegation, action, complaint or proceeding."  [*Id.*, ¶¶ 3(e), 5.]  Thus, the Mwales are entitled to raise and use the Release Agreement as a complete defense and bar to the fraud, negligent misrepresentation, and unjust enrichment claims that the Shaws assert against them in this case, and the forum selection clause in that Agreement plainly applies to those claims since the Mwales will seek to enforce the release contained in that Agreement.  *See Kelvion, Inc. v. Petrochina Can., Ltd.*, 918 F.3d 1088, 1093 (10th Cir. 2019) (finding that a forum selection clause applies where "the contract containing the clause is raised only as a defense, rather than on the face of the complaint"); *MPVF Lexington Partners, LLC v. W/P/V/C, LLC*, 148 F. Supp.

3d 1169, 1179 (D. Colo. 2015) (indicating that "a forum selection clause can apply even when the contract at issue is raised only as a defense to the plaintiff's claims").

### 3.  The Forum Selection Clauses Are Mandatory.

Forum selection clauses are classified as "either mandatory or permissive." *Excell, Inc. v. Sterling Boiler & Mech., Inc.*, 106 F.3d 318, 321 (10th Cir. 1997).  "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum." *Id.* (brackets and internal quotation marks omitted).  The forum selection clauses in the Loan Modification Agreement and Release Agreements state that the "***exclusive venue*** for any dispute between the parties ***shall*** be brought in the United States District Court for the Southern District of New York."  [Ex. 4, ¶ 8; Ex. 4 (Ex. A), ¶ 8 (emphasis added).]  The language in these clauses—"exclusive venue" and "shall"—unquestionably make these clauses mandatory forum selection clauses requiring that any disputes between the Shaws and the Mwales be brought in the Southern District of New York.  *See Excell*, 106 F.3d at 321 (finding a clause stating that venue "shall" lie in the County of El Paso, Colorado to be mandatory); *Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc.*, 428 F.3d 921, 927 (10th Cir. 2005) (finding a clause designating Colorado state courts as the "exclusive forum" for the resolution of disputes to be mandatory).

### 4.  The Court Must Enforce the Mandatory Forum Selection Clauses.

"[A] valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 63 (brackets and internal quotation marks omitted).  "Only under extraordinary circumstances unrelated to the convenience of the parties should a §1404(a) motion be denied." *Id.* at 62. "Ordinarily, the district court would weigh the relevant

factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interest of justice.'" *Id.* at 62–63 (quoting 28 U.S.C. §1404(a)). However, where a valid forum selection clause exists, as is the case here, the Court must adjust this typical § 1404(a) analysis in three ways. *See Atl. Marine*, 571 U.S. at 63. First, "the plaintiff's choice of forum merits no weight." *Id.* at 63. Second, "arguments about the parties' private interests" cannot be considered and the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64. The Court "may consider arguments about public-interest factors only." *Id.* Those public interest factors include: (1) "the administrative difficulties flowing from court congestion;" (2) "the local interest in having localized controversies decided at home;" and (3) "the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (internal quotation marks omitted). "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64. Finally, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a §1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." *Id.*

Here, no "extraordinary circumstances" exist that would warrant the Court denying the Mwales' request to transfer this case to the Southern District of New York. Further, the public interest factors that the Court may consider in deciding whether to transfer the case either favor transfer or are neutral.

- First, both the Southern District of New York and the District of Utah are relatively congested compared to many other federal district courts. However, the most recent

Federal Court Management Statistics indicate that the Southern District of New York has 23 more judges than the District of Utah.  [*See* Federal Court Management Statistics (June 30, 2024), attached as Ex. 5.][10]  Moreover, the time from the filing of a civil case to disposition in the Southern District of New York (6.3 months) is significantly lower than in the District of Utah (9.3 months).  [*Id.*]  The number of pending cases per judge in the Southern District of New York (591) is slightly higher than in the District of Utah (511), but the number of cases being filed in the Southern District of New York has been decreasing (-4.2%), while the number of cases filed in the District of Utah has been increasing (+2.0%).  [*Id.*]  Accordingly, the court congestion factor is either neutral or slightly favors transfer to the Southern District of New York, particularly since there are many more judges available to address this dispute.

- Second, there is no particular interest that Utah has in deciding this case.  The Shaws agreed to the forum selection clauses designating the Southern District of New York as the "exclusive venue" for any disputes with the Mwales.  Moreover, there is nothing about the tort and contract claims asserted by the Shaws in this case that Utah has any particular interest in deciding.  This dispute is between private parties and does not implicate the public interest or any local interest.  Therefore, this factor also either neutral or slightly favors transfer.

- Third, the Southern District of New York is best equipped to apply New York law to this dispute.  The Shaws and the Mwales agreed that the "laws of the State of New York" govern the "validity, construction, enforcement, and interpretation" of the Loan Modification

---

[10] Only the statistics for the Southern District of New York and the District of Utah are included in Exhibit 5.  The complete set of statistics is available at: https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2024/06/30-1

Agreement and Release Agreement.  As addressed above in Section B.2., *supra*, the claims the Shaws assert in this case directly implicate the validity, construction, enforcement, and interpretation of those Agreements.  Therefore, this factor weighs in favor of transfer to the Southern District of New York since that court is more familiar with New York law than this Court.

Simply put, given the facts and circumstances of this case, the valid and mandatory forum selection clauses in the Loan Modification Agreement and Release Agreement must be enforced and this case transferred to the Southern District of New York, if it is not dismissed for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, the Mwales respectfully requests that the Court dismiss this case for lack of personal jurisdiction, or alternatively, transfer this case to the United States District Court for the Southern District of New York.

DATED:  November 8, 2024.

/s/ *Nicole A. Skolout*
TOMCHAK SKOLOUT
Jenifer L. Tomchak
Nicole A. Skolout

*Attorneys for Defendants Julius Mwale and Kaila Mwale*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 8th day of November, 2024, I filed the foregoing

**DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION,**

**OR IN THE ALTERNATIVE, TO TRANSFER VENUE TO THE SOUTHERN**

**DISTRICT OF NEW YORK** via the Court's ECF/CM filing system, which electronically

served all counsel of record.

*/s/ Nicole A. Skolout*