# EXHIBIT 3

From: Aaron Clark <AClark@atllp.com>
Date: Mon, Apr 10, 2023 at 8:06 PM
Subject: Mwale Demand Letter and Draft Complaint [IWOV-IDOCS.FID5076176]
To: Matthew Weiss <mjweiss@weissandassociatespc.com>
CC: Trinity Jordan <TJordan@atllp.com>

Matthew –

I hope the weekend treated you well.

As I mentioned in our phone call on Friday, I've set forth the Shaws' demands in the attached letter, as well as the complaint we intend to file if the Mwales do not return their money by the close of business on April 17.

Please feel free to reach out of if you have questions.

Thanks,

Aaron

**Aaron B. Clark | Partner**

Armstrong Teasdale LLP
New York | London | Dublin | Boston | Philadelphia | **Salt Lake City** | Denver | Las Vegas | Kansas City | St. Louis | Delaware | Miami
Office:  801.401.1603

Cell:  619.518.6014

aclark@atllp.com
www.armstrongteasdale.com



1

********** PRIVATE AND CONFIDENTIAL**********

This transmission and any attached files are privileged, confidential or otherwise the exclusive property of the intended recipient, Armstrong Teasdale LLP or its subsidiaries.  If you are not the intended recipient, any disclosure, copying, distribution or use of any of the information contained in or  attached to this transmission is strictly prohibited. If you have received this transmission in error, please contact us immediately by email (admin@atllp.com) or by telephone (+1 800.243.5070) and promptly destroy the original transmission and its attachments. Opinions, conclusions and other information in this message that do not relate to the official business of Armstrong Teasdale LLP or its subsidiaries shall be understood as neither given nor endorsed by it. Armstrong Teasdale LLP and its subsidiaries may monitor email traffic data. Please read our Global Privacy Policy to find out how Armstrong Teasdale LLP and its subsidiaries process personal information.

Armstrong Teasdale LLP is a Missouri-registered limited liability partnership organized under the laws of the State of Missouri, USA. The London office of Armstrong Teasdale LLP is operated by Armstrong Teasdale Limited, a private limited company registered in England and Wales (Registration No. 08879988), that is authorized and regulated by the Solicitors Regulation Authority (SRA No. 657002). The registered office of Armstrong Teasdale Limited is **38-43 Lincoln's Inn Fields, London WC2A 3PE**. Please review our International Legal Notices.

Aaron B. Clark (UT Bar No. 15404)
Trinity Jordan (UT Bar No. 15875)
ARMSTRONG TEASDALE LLP
222 South Main Street Suite 1850
Salt Lake City, Utah 84111
(801) 643-1656
aclark@atllp.com
tjordan@atllp.com

Douglas N. Marsh (UT Bar No. 18636)
ARMSTRONG TEASDALE LLP
4643 South Ulster Street Suite 800
Denver, Colorado 80138
(720) 200-0676
dmarsh@atllp.com

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MATHEW SHAW and BROOKE SHAW, <br><br> Plaintiffs, <br><br> v. <br><br> JULIUS MWALE and KAILA MWALE, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. <br><br> The Honorable Judge |

Plaintiffs Mathew Shaw and Brooke Shaw, by their undersigned counsel, state as follows for their Complaint against Defendants Julius and Kaila Mwale.

### PARTIES

1.      Mathew Shaw is a resident of Utah.

2.      Brooke Shaw is a resident of Utah.

3.      Julius Mwale is a citizen of Kenya. His primary residence is located in California. He also owns a residence in New York.

4.      Kaila Mwale is a citizen of New York

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000 and is between Plaintiffs, who are citizens of Utah, and Defendants Julius and Kaila Mwale, who are respectively a citizen of a foreign state and domiciled in California and a citizen of New York.

6.      The Court has specific personal jurisdiction over Defendants because, as set forth in the allegations below, Plaintiffs' claims rise from Defendants' contacts and activities in the State of Utah, including but not limited to directing fraudulent representations towards Plaintiffs in Utah.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## FACTUAL BACKGROUND

*Julius and Kaila Mwale Make the Initial Connection with the Shaws*

8.      Mat and Brooke Shaw first met Julius and Kaila Mwale on February 18, 2022, where Mat and Savanna Shaw (Mat and Brooke Shaw's oldest daughter) performed for guests that were invited to a private dinner party.

9.      The dinner included a number of wealthy, influential, and prominent attendees. These attendees included United States' Senator Mitt Romney.

10.     Julius Mwale ("Julius") and Kaila Mwale ("Kaila") also attended the February 18, 2022, dinner.

11.     Presenting themselves as billionaires, Julius and Kaila Mwale made an immediate connection with the Shaws, initially under the guise that their children could be friends.

12.     Soon after making this connection, Julius began sending Mat text messages sharing recordings of supposedly private video calls and emails with prominent individuals such as Senator Romney, Meg Whitman (the U.S. Ambassador to Kenya), and others.

13.     Julius also shared supposedly confidential contracts with prominent companies, all in an apparent effort to bolster his credibility with Mat and Brooke.

14.     Other videos Julius sent appeared to show the Mwale children on what was represented to be one of the Mwales' private jets.

15.     Julius represented that he owned the jet, though the Shaws recently learned Julius does not own the jet but leases it from a company in which Julius has no ownership interest.

16.     The Mwales also invited the Shaws to visit their estate in San Jose, California, which they did on several occasions.

17.     Julius represented that he and Kaila owned this estate, though the Shaws would later learn that neither Julius nor any holding company he owns has title to the property.

18.     During the Shaws' visits to the San Jose property, Julius and Kaila showed off extravagant features of the estate, including expensive cars (that they claimed to own) worth hundreds of thousands of dollars and a wine cellar they claimed held a wine collection valued at approximately $250 million.

19.     The Mwales also claimed that they owned a jewelry collection worth $870 million.

3

20.    In further overtures to strengthen ties with the Shaws, the Mwales expressed interest in being "godparents" to the Shaw children.

21.    The purpose—and, ultimately, the effect—of these interactions was to suggest to the Shaws that Julius and Kaila were persons of importance and influence, with access to power and significant means, and that associating with them would provide the Shaws with potentially lucrative opportunities.

*Julius and Kaila Mwale Reveal their Pitch*

22.    Julius Mwale and Kaila Mwale then began sharing with the Shaws their vision of "changing the world" and "solving world hunger."

23.    The Mwales also offered to include the Shaws in their plans, which they claimed would give the Shaws an opportunity to build "generational wealth."

24.    By March 2022—and specifically on or around March 18, 2022—the Mwales were pushing the Shaws to contribute toward a series of investment opportunities run by Julius.

25.    In the March 18, 2022, meeting—an in-person meeting at the San Jose estate with Julius and Kaila—the Mwales represented that the Shaws' investment would generally be put toward building a battery manufacturing plant and surrounding infrastructure.

26.    In a later in-person meeting on May 20, 2022, Julius represented that several African countries had gifted him millions of acres of land to help build energy-efficient self-sustaining cities, similar to one he claimed to have already built in his hometown in Kenya.

27.    Julius Mwale further claimed at this May 20, 2022, meeting that the Shaws' money would be spent on geological surveys in the Democratic Republic of the Congo (DRC) to build infrastructure that would eventually support a battery manufacturing plant.

28.     Also at the March 18, 2022, meeting, the Mwales made each of the following claims set forth in paragraphs 29 through 41.

29.     Julius and Kaila claimed that local farmers in the area of these cities he was helping to develop benefitted from the rising value of the nearby land, making them millionaires (in U.S. dollars).

30.     Julius and Kaila claimed that their programs included development of the surrounding area, including building a golf course on donated land and building rental homes on the farmers' properties (to be donated to the farmers for free) so they could generate rental income.

31.     Julius and Kaila claimed that they had built the largest, most advanced hospital in the world, with state-of-the-art technology, five thousand beds, and an advanced cancer treatment facility.

32.     Julius represented that he had been gifted land that included 12 undeveloped cobalt mines in various parts of Africa, including the DRC, to develop in order to build battery manufacturing plants.

33.     Julius and Kaila introduced the Shaws to certain individuals that were close partners in their operations, including a man named Derek William, whom the Mwales represented was a rocket scientist they had "poached" from Boeing, and who supposedly owned the company "KE International."

34.     Julius and Kaila also introduced the Shaws to "Christine Allyn," who was supposedly Julius's chief of staff.

35.     Julius and Kaila claimed Christine was a former personal assistant for Kofi Annan, the former United Nations general secretary.

5

36.    Julius represented that KE International was an independent, third-party construction and engineering company that he had awarded the contract to for the purpose of building these self-sustaining cities.

37.    Julius and Kaila told the Shaws that the Mwales typically relied on their own assets for investment opportunities of this kind, but that they were "allowing" a close circle of family and friends, including the Shaws, to contribute upwards of $50 million as outside investors in the project;

38.    Julius told the Shaws that "the window was closing" and time was "running out" and that he wanted them to be able to participate in the investment;

39.    Julius offered to take money from the Shaws as a "loan" with a guaranteed twenty-percent per annum return. Nevertheless, Julius and Kaila both assured the Shaws that the upside on their investment would not be limited to repayment on the loan, but would be rolled into the investment with the potential to generate returns of ten times the initial contribution;

40.    Julius and Kaila provided further reassurance by promising that if the Shaws ever wanted back the money they were investing, the Mwales would simply return the Shaws' contribution—even if it meant having to sell a few bottles from their wine collection.

41.    Julius and Kaila also represented to the Shaws that the funds they were contributing would be rolled into investments managed by Julius's parent company, Tumaz and Tumaz, which Julius and Kaila had repeatedly represented was worth approximately $50 billion.

*The Shaws Agree to Participate in the Investment*

42.    Swayed by these promises and assurances, the Shaws agreed to invest in the Mwales' projects.

6

43.     The Shaws made their first monetary contributions to the Mwales on April 4, 2022.

44.     By June 22, 2022, the Shaws had paid the Mwales a total of approximately $1.7 million.

*The Shaws Learn the Truth*

45.     In August 2022, the Shaws visited Kenya to see the results of their massive investment.

46.     The trip to Africa, which included visits to the coast and an African safari, quickly turned south when the Shaws arrived at Julius's purported self-sustaining city.

47.     The hospital, previously represented as the world's largest and advanced, was a complete construction mess—as it had been, the Shaws later learned, for more than five years.

48.     Only one wing of the hospital was working, with a run-down clinic on the first floor.

49.     Contrary to Julius's representation, the hospital appeared to have no advanced cancer treatment facility.

50.     The hospital was, in short, simply a shell—nothing like what was represented.

51.     The contrast between the Mwales' representations and the reality conveyed to the Shaws the clear impression that the hospital was a mere ruse the Mwales used to tell others that he had founded a bustling city in Kenya.

52.     The golf course, supposedly built on ancestral lands donated by local farmers, was also nothing like what was represented.

53.     The course was unfinished. There was no clubhouse, and no facilities. In fact, the greens had no holes.

54.    Julius also showed the Shaws the rental homes he claimed to have built to generate revenue for the farmers. The homes were vacant.

55.    The individuals who worked with the Mwales also turned out to be other than as advertised.

56.    Derek William, whose actual name is Derek William Knox, and Christine Allyn—whose actual name is Allyn Knox—are actually Kaila's siblings.

57.    This was contrary to the stories relayed by Julius, Kaila, Derek, and Christine.

58.    Derek and Christine both live with the Mwales at their San Jose estate.

59.    On information and belief, the Shaws allege that Derek does not own KE International.

60.    Christine, meanwhile, was simply Kofi Annan's granddaughter's nanny.

*The Shaws' Demands to have their Money Returned are Ignored*

61.    Alarmed by the contrast between representation and reality, on September 9, 2022, the Shaws asked the Mwales to return the money the Shaws had invested.

62.    At that time, the Mwales represented that they would return the Shaws' money after a 60- to 90-day "due diligence" period.

63.    The Shaws and Mwales had phone calls roughly every two weeks since that date, with the Mwales continually furnishing excuses for why the money could not be returned.

64.    After the Mwales represented that the due diligence period had been extended to 120 "business" days, they gave the Shaws a "worst case" scenario of March 5, 2023, for a return of their money.

8

65.     The Mwales have yet to return the Shaws' money, and it is becoming increasingly clear that the prospects of getting their money back are unlikely.

66.     In short, it is now clear that the Mwales scammed the Shaws, misleading the Shaws to "invest" roughly $1.7 million in a fraudulent investment scheme.

## COUNT ONE
### Fraud

67.     The Mwales made a series of representations to the Shaws, including but not limited to those representations on March 18, 2022, and May 20, 2022, referenced above.

68.     The Mwales made these representations with the intent of inducing the Shaws to give money to the Mwales.

69.     The Mwales' representations were false.

70.     The Mwales knew their representations were false.

71.     The Mwales also knowingly omitted crucial facts from their communications with the Shaws, including but not limited to such facts as would have shown that their prior representations were false.

72.     The Shaws reasonably relied on those representations and gave the Mwales approximately $1.7 million.

73.     As a direct and proximate result of the Mwales' fraudulent misrepresentations and omissions, the Shaws have been damaged in an amount to be determined at trial, but which includes at a minimum the roughly $1.7 million they gave to the Mwales.

## COUNT TWO
### Negligent Misrepresentation

74.    The Mwales made a series of representations to the Shaws, including but not limited to those representations on March 18, 2022, and May 20, 2022, referenced above.

75.    The Mwales made these representations with the intent of inducing the Shaws to give money to the Mwales.

76.    The Mwales' representations were false.

77.    The Mwales had no reasonable grounds for believing their misrepresentations were true.

78.    The Mwales also unreasonably omitted crucial facts from their communications with the Shaws, including but not limited to such facts as would have shown that their prior representations were false.

79.    The Shaws reasonably relied on those representations and gave the Mwales approximately $1.7 million.

80.    As a direct and proximate result of the Mwales' negligent misrepresentations and omissions, the Shaws have been damaged in an amount to be determined at trial, but which includes at a minimum the roughly $1.7 million they gave to the Mwales.

**COUNT THREE**
**Unjust Enrichment**

81.    The Mwales received a benefit from the Shaws in the form of the approximately $1.7 million conveyed by the Shaws.

82.    The Shaws' conveyance of this benefit to the Mwales was to their own detriment, in that it deprived them of the monies so conveyed.

83.    The circumstances of this case are such that it would be unjust for the Mwales to retain the benefit conveyed by the Shaws without paying for the benefit.

84.     Equity demands that the Shaws be compensated for the benefit they conferred upon the Mwales by the return of the monies so conveyed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

a)      Actual and consequential damages in an amount to be proven at trial;

b)      Pre- and post-judgment interest; and

c)      Any other relief warranted by law and/or which the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all claims triable to a jury.

Dated: April 17, 2023                    Respectfully submitted,


                                         By: /s/ *Aaron B. Clark*
                                         Aaron B. Clark (UT Bar No. 15404)
                                         Trinity Jordan (UT Bar No. 15875)
                                         ARMSTRONG TEASDALE LLP
                                         222 South Main Street Suite 1850
                                         Salt Lake City, Utah 84111
                                         (801) 643-1656
                                         aclark@atllp.com
                                         tjordan@atllp.com

                                         Douglas N. Marsh (UT Bar No. 18636)
                                         ARMSTRONG TEASDALE LLP
                                         4643 South Ulster Street Suite 800
                                         Denver, Colorado 80138
                                         (720) 200-0676
                                         dmarsh@atllp.com

                                         *Attorneys for Plaintiffs*

11



Aaron B. Clark

Direct **T** 801.401.1603

aclark@atllp.com

April 10, 2023

Matthew Weiss, Esq.
mjweiss@weissandassociatespc.com

**Re:**      **Julius and Kaila Mwale**

Dear Mr. Weiss,

      As we discussed last week, I represent Mat and Brooke Shaw in their efforts to recover the $1,697,543.20 they invested with Julius and Kaila Mwale in three separate payments from April to June 2022. I understand you only represent Kaila Mwale at this time. We have, of course, discussed the three promissory notes Ms. Mwale signed and delivered in conjunction with the Shaws' three contributions. I have further alerted you to the promises the Mwales made to the Shaws prior to their sending those contributions, i.e., that they would return the Shaws' money any time they needed it – even if it required the Mwales to sell off a few bottles of wine, or some of their apparently extensive (and expensive) jewelry collection.

      I have even provided you a recent recorded call in which your client and Julius Mwale confirm as much.

      Frankly, in the seven months since the Shaws first requested a return of their investment, the Mwales have not been forthcoming. Despite claiming to be billionaires (50-60 times over), the Mwales have furnished excuse after excuse for delaying the promised return of the Shaws' principle. The excuses (almost all of which are recorded) border on non-sensical, and this is without taking into account the Mwales' claimed net worth and supposed affinity for my clients' family.

      I have told you that I am a recently former federal prosecutor – an Assistant United States Attorney who spent the last six years prosecuting white collar fraud schemes here in Utah. As such, I am familiar with many of the hallmarks of fraudulent schemes and those who perpetrate them. And while I cannot be certain what, exactly, the Mwales have done with the Shaws' money, or how much money the Mwales actually have, I *am* certain that their actions and demonstrably false representations raise a number of red flags – red flags that align very closely with many (if not all) of the other fraudulent schemes I helped prosecute.

CCNameList
April 10, 2023
Page 2

I *very much* hope that I am wrong, but I am concerned that the Mwales have perpetrated a fraud against the Shaws (and possibly others), and this explains their failure to repay the Shaws, as they have repeatedly promised to do.

I offer all of this as background and context for the demand I made to you on the phone last Friday: The Mwales have until the close of business on April 17, 2023, to return the $1,697,543.20 they have of the Shaws' money. If they do not return the Shaws' funds by that time, we will be filing the attached complaint. We will further take whatever actions might be necessary to help bring attention to this situation and facilitate a return of the Shaws' investment.

I would be happy to discuss any questions or concerns you might have. I will not, however, be extending the deadline any further.

Sincerely,

Aaron B. Clark

cc:    Trinity Jordan

ARMSTRONG TEASDALE LLP